May it please the Court, my name is Robert Freeman. I am the attorney who represents the appellants in this case before you this afternoon. The appellants are police and detention center officers from the City of North Las Vegas. I also represent the City of North Las Vegas, the North Las Vegas Police Department, and the former chief of the detention center, Ken Ellingson. This is an interlocutory appeal from the Nevada District Court's denial of qualified immunity, or summary judgment, in part requesting qualified immunity on behalf of the individual. He is the policeman who arrested him, and I guess for him, Hibble is the great news. Very good news. But the police in the jail, or the guards in the jail, it doesn't matter to them, right? No, Hibble doesn't matter to them. Their actions are evaluated. Because Mr. Smith was a pretrial detainee, their actions are evaluated under the 14th Amendment. There was one very damaging piece of evidence where some, I think it was a woman who was a guard at the jail, told somebody else that Smith had done something offensive, so they beat him up. Yeah, you're speaking... Well, we would obviously argue that it's not just hearsay, it's hearsay within hearsay. Where would you find that statement? I read about it in the briefs, and I haven't found it in the excerpts. On page 102 of the excerpt of the Record on Appeal is a portion, I think it's the entire deposition of Officer Cardinale. And the specific statement is found, that's a page divided into four sections, the specific statement is found on page 10, line 7, where Officer Cardinale said they had heard a rumor that Jeffrey Smith was over at the jail and that he had shit himself and flung feces at the corrections officers and they used force on him. We would take the position that that's classic hearsay, it's hearsay within hearsay, because the declarant wasn't even the person that was part of the detention center workforce, and she herself... Was there anything more concrete than that? No, that's it. Even the declarant... But a lawyer might be able to track it down and get some direct evidence. Well, even the declarant, I think her name was Janie Zack, was deposed and she denied ever making that statement. The one that's supposed to have said it, and she said she didn't? Right. So we would argue that that is not evidence that should or could have been considered by the Nevada District Court in creating what they... It's hard to determine what the Nevada District Court really did with the qualified immunity arguments of the detention center officers, because what they really said was, what the district judge really said was, is that I don't have a well-developed enough record to make a determination. What I think they were really saying, what I really think the Nevada District Judge was doing was making the same mistake that was discussed in Saucier, and he was confusing the evaluation of whether the force was reasonable for purposes of qualified immunity with whether the force was reasonable for purposes of the underlying claim. An officer, any public official, is entitled to an evaluation of their use of force against the undisputed facts in the case. So you have Cardinale, he's out. Let's just assume that for a second. Then you move to, you've got Leone and Bender, right? Yes. There's the incident in the shower. And then after that, then you've got Ellingson, the city, the police department, and the detention center, which deal with... Provision of medical treatment. Yes. Okay, so now Leone and Bender, there's the situation, you've got a drunk guy in the shower, right? Yes. And they claim that they push him, he slips and falls, and, well, he tries to get away, and they push him, he slips and falls. That's correct. And he claims, he can't rebut this with anything, because he's... His memory... He has no memory of it, and we don't know whether, you know, when that occurred. But the fact that he has no memory of it can't be fatal in all cases, because obviously you could just beat someone to a pulp, and then of course they wouldn't be able to remember, and that can't automatically entitle you to qualified immunity. Well, and that's not the argument I would make. I would make the argument that they have to come forward with some evidence, though. A statement like... The medical evidence there was that he is hurt after the situation in the shower, correct? He is hurt. Is there any evidence that he couldn't have gotten the injury by more than slipping and falling? Is there any evidence that he couldn't have gotten it? In the record of the medical evidence, is there any medical evidence that would say... I mean, the officers say he tries to run out, they push him, he slips, falls on his head, gets scraped, and, you know, all of those incidents. And then is there any medical evidence that says, no, it couldn't have happened that way, you know, he's got too many injuries? I mean, that would be evidence that... The doctor who examined Mr. Smith at University Medical Center at the end of this event testified that his symptoms were consistent with a subacute closed head injury that occurred two to five days prior to his examination. That's it. The problem here is you've got a guy who goes into police custody thinking drunk and defecating and urinating on himself, and he comes out of police custody with a fractured skull, a coma, and permanent brain damage. And obviously it happened while he was in police custody. Well, I don't agree with that statement, Your Honor. I don't think it obviously occurred. Excuse me? What am I missing? The whole circumstances of his drinking binge before he ever got to the detention center are where there is evidence that he was injured there. I mean, you'll recall that he began drinking on January 26th in the morning, and he wasn't arrested until January 27th at 3 a.m. That whole period of time... Evidence that he got a skull fracture and went into a coma. He was found unconscious in the alley behind the Roper Bar on January 26th at 8.45 p.m. If there had been any indication that he wasn't just a passed-out drunk, I think we'd get something in the records. Well, as Dr. McDonald, who is the doctor at UMC who ultimately looked at Mr. Smith, testified, he was taken before he went to the detention center, he was taken to the hospital three times, and Dr. McDonald testified how and why these ER doctors would have missed a closed-head injury. They would have missed the closed-head injury because he didn't have any external indication of injury. They wouldn't have done a CAT scan because of his extreme intoxication. He was 0.27. So they would have assumed that he was extremely intoxicated, which he was extremely intoxicated. Did he have a skull fracture or just a concussion? He had a skull fracture. Right. Dr. McDonald testified that those symptoms of skull fracture would occur two to five days after the injury when the brain began to swell to the point where the symptoms would he may have been exhibiting symptoms of closed-head injury. The problem here is that no one could see it because he was so extremely drunk. Everyone drew the reasonable conclusion that he's intoxicated. Well, let me ask you this. Obviously, if there's an indication of excessive force in the shower, Leone and Bender, you know, they've got trouble. Don't get qualified immunity, of course. If he slipped and fell in the shower and that's where he got injured, and then at that point they took him to this nurse, is it Chesler? Chesler. All right. What more did they have to do at that point? Well, and that would bring me to my sort of fallback position. Assuming that he did suffer this injury in the shower, that is not dispositive of whether excessive force was used. Excessive force is evaluated certainly in part by virtue of the injury that results, but as important is what force was actually used and why was it used. And in this case he couldn't be in a coma if he tried to make a run for it in the shower. Well, he wasn't in a coma in the shower, Your Honor. So what he could have done is like some drunks, they don't guard themselves when they slip and fall. They don't put their hands in front of them to break the fall. So he could have hurt himself just by slipping and falling like the guards said. He absolutely could have. He could have hurt himself because the guards purposely beat his head in. Well, they said they pushed him, though, didn't they? But there's no evidence that they beat his head in. You know, Officer Leone was asked during his deposition whether there was any indication that Mr. Smith had hit his head in this slip, and he testified that there was not. They took him directly, as you state, to the medical officer on duty to have him checked out, and that medical officer found a scrape on his back and buttocks. Was there evidence of a blow to the back of his head? No physical evidence. The doctor ended up testifying that his injuries are consistent with a blow to the back of his head because he had frontal lobe concussion. He had a fracture to the front, and that was consistent because of physics with him hitting the back of his head. Also consistent with him getting mugged in the alley behind the Roper bar. With respect to the ñ you know, that's ñ All right, assuming that you get past that, then that his being in the cell all that time, nude, and not taking care of him, I don't see how you get past that. I mean, it's a question ñ The provision of medical treatment? You're speaking of the provision of medical treatment? Yes. The provision of medical treatment, obviously there were other defendants in this case. One of those defendants was Correctional Medical Services, who was the independent contractor in the city of North Las Vegas hired to provide medical treatment. That's a little confusing for me here. I can easily clear that up for you. The nurse that you mentioned, Chesler, was an employee of Correctional Medical Services, as is defendant Gilbert Arguello. And someone named Hobson. They were all employees. They all had their motions for summary judgment, which were granted to a large extent, although I don't think they were granted with respect to Mr. Chesler. Because Mr. Chesler was the medical personnel in the best position to have identified that Mr. Smith had an injury and did nothing effective to address it. And that's not before us. And that's not before you. What is before you is this idea that obviously, not obviously, it appears that the plaintiff is also suing Liani and Bender under an Eighth Amendment argument that they failed to provide medical treatment. And I don't see any evidence to suggest that they're liable for that. That's part of the opposition brief that we got. As you know, under the Farmer case and under your own Gibson case, this evidence of subjective awareness that Mr. Smith had not only a serious medical condition, but one which if they did nothing to help him, he was going to sustain a grievous injury, there's no evidence of that in this case. With respect to the City of North Las Vegas defendants, the City of North Las Vegas defendants, as the record indicates, took Mr. Smith and requested medical attention at least four times during his stay in the city. Well, the city is the police officers, right? The city employs the police officers and the detention center officers. The plaintiff has sued the North Las Vegas defendants. Let me follow up. When a government incarcerates somebody in jail, they're liable for his care there, and if they contract it out, all it gives them is a third-party action against whoever they contracted out to. Well, my response to that, Your Honor, would be that in order to find the type of liability that occurs under the Eighth Amendment, you have to find this subjective element, this subjective intent. It's not enough to say that we have a contractual obligation and it somehow flows to us through our contract. I find it unrealistic about drunks who defecate and urinate on themselves. I mean, I've seen some people like that. They tend to stimulate hostile feelings in those who have to deal with them. Well, and isn't that so highly plausible? I wonder if that's enough for an inference for the subjective part. That they knew that he had this closed-head injury? Someone likes handling a guy who behaves that way. Well, it's a substantial leap to say that just because you don't want to handle somebody, and I'm willing to submit that that was undoubtedly the case, that to make the step that you have a subjective knowledge that he's got a closed-head injury, especially in light of the fact that these are not. Closed-head injury would have to be from what you can observe of him in that cell. Exactly. And at that point, you remember, he's .27 blood alcohol content. He is not coherent for the reason, the obvious reason that. The doctor who testified, you can't tell the difference between somebody who's dead drunk and somebody who's brain damaged? That Dr. McDonald testified during his deposition that it would be difficult. I think that's in the record at page 227. That it would be difficult to determine. He explained in there that one of the ways you would diagnose a closed-head injury with an intoxicated person is lapse of time after a period of time when they would no longer be intoxicated if they're still exhibiting symptoms consistent with some kind of mental stress, injury, that you have to look further into it. He also said that if people were. Basically, you can't tell if a person's brain damaged while he's drunk, except that after he's sober, he's still, his brain's not working. Well, there's no way I would go that far, Your Honor. I would say that Dr. McDonald was explaining why the ER doctors did not do a CAT scan when he was first brought in any one of the three previous times. Blood. What was the evidence on blood? There was blood on his nose the second time he went to Lake Mead Hospital. This is after the incident at. The nose is not that big a deal. Did the blood stop? It was dried blood that was on his. Any blood coming out of his ears? No. Blood coming out of his mouth? No. Blood coming out of his eyes? No. I'll close by saying that we would like to also take advantage, to the extent that you are able to determine or do determine that either Officer Cardinale or the individual detention center officers did not violate the constitutional rights of Jeffrey Smith, we would ask that the Monell claims against those, the underlying Monell claims against those entities be dismissed pursuant to your decision in Husky. We believe that if these officers did not violate the constitutional rights of Jeffrey Smith, there couldn't be an underlying Monell claim. And if there aren't any more questions, I'll. Thank you, counsel. Thank you. May it please the Court, Count Potter, on behalf of Jeff Smith, I would just point out to the Court that as we stated in our brief, there's an argument here that this Court does not have jurisdiction over this interlocutory appeal based upon the fact that there are divergent facts as pointed out by Judge George in his order. I would submit also that as to the. . . I didn't get whether that had anything to do with jurisdiction. Well, the fact that there is a discrepancy as to facts, which he did go through a complete analysis of Saussure as well as looking at the. . . Saussure tells us you take the facts as the plaintiff puts them and see if the claim would be made up. And he went through that analysis as well as going through the further analysis of, as required under the State of Ford v. Ramirez and looking at the qualified immunity inquiry. First of all, do you have anything left on the policeman who arrested Smith when the Hipples come down? Let me explain my position on Hipple. When the United States Supreme Court came down with Hipple, of course they didn't talk about Jim Carrey v. Nevada Gaming Control. At the time that this decision was made in district court, Judge George was bound by the ruling out of the Ninth Circuit on Jim Carrey v. the Nevada Gaming Control Board, holding that in fact the statutes in question were unconstitutional. I want to know if anything is left of your case against the arresting officer after Hipple. Well, what happened was they said that the issue that was raised, the constitutional claim does not stem from an absence of probable cause to arrest, but the alleged unconstitutionality of the statute justifying the arrest, going back to Kollander v. Lawson saying that in fact those vagrancy-type statutes that were held unconstitutional prior to Carrey were on a void for vagueness. The same argument could be made as to the Nevada statute, that in fact the Nevada statute is void for vagueness. The United States Supreme Court, instead of looking at the issues of Carrey, did not even address Carrey. And they said, well, apparently they didn't raise that in the courts in Winnemucca, Nevada, where that case came out of. They never raised whether in fact there was an issue of void for vagueness. I would submit to the court that the statute in question does not arise to the Cherry-type standard of a reasonable suspicion. And as I heard the Court announce in another argument, that is the Cherry standard, reasonable suspicion. And our statute in Nevada doesn't. It says under circumstances which reasonably indicate. And I would submit that reasonably indicate is not the proper standard and that, once again, it leaves less than reasonable suspicion, certainly not probable cause. So we're over here on this other issue. Let me ask you about another thing that's on my mind. What is the evidence that's cognizable under Rule 56C and 56E that anybody in the jail beat the smith's head in? Well, you have the, you have the. As opposed to him just slipping in the shower. Well, you have. He's drunk now, putting his arms out to guard him. Well, no, he doesn't. Your eyes slip in the shower. We put our hands out. Maybe we hurt ourselves. Maybe we dislocate a shoulder. But we don't fracture our skull. If you're drunk, you don't put your hands out, you fracture your skull. It didn't fall that way. What's the cognizable evidence in your record in this case that anyone beat him up in the jail? First of all, with your issue, that's not the way he fell. That's not where the skull fracture is. But what's important is what the judge pointed out in looking at the facts most favorable to the plaintiff in this case and denying qualified immunity was not only the statements. But the statement is big. The statement comes from Cardinale because Jeff Smith was thought to, was going to die from the swelling that was taking place. Cardinale wasn't an eyewitness to the shower incident, was he? No, he wasn't. So how can you give any cognizable evidence? It is cognizable because it's a co-conspirator type statement. He is one of the individuals that. Let's say Cardinale can testify to an admission by a defendant. Which defendant admitted something? Well, the statement comes from Zach. It comes from another party. It comes from another officer. Zach is not a party to the case. Your opponent said that all Cardinale said was that he heard a rumor, not that Zach said that she had seen this. No, she didn't say that she saw it. Zach is a wife of another correctional officer, and she is a patrol officer. And what he testified to is that she was over by the motorcycles, and he heard the language was that this guy had shit all over himself and had thrown feces at him and that they thumped him. I mean, that's what the statement was that is attributable. But then you look to the race-ipsotype situation here, Your Honor. But for the fact of the actions of these officers, how does this individual receive a skull fracture, a bleed? The race symptom has some appeal, but the problem with it is that it's so drunk, and people who are that drunk hurt themselves. They don't get skull fractures, Judge. They do. And what happened? Well, there's certainly nothing in our record that individuals that get drunk suffer from skull fractures. There's certainly nothing in the record. But to the contrary, you have the admission by Leone. It's not like he said, hey, nothing happened with this guy. I don't know how in the hell he got his skull fracture. That's not what he says. He says, listen, the guy came at me, and I made a determination that I was going to put him back in there. And then, I mean, there's the old classic. He slipped in the shower. And what the testimony from Dr. McDonald is, is that this is consistent with what he bangs his head and receives a skull fracture. Not only a skull fracture, but he has bleeds. So you have him taken over to the trauma center 36 hours after he was brought in. And in terms of the questions that you were asking before that are important here is, how does an individual stay in a nude position for 36 hours? Okay, but I guess what I want to know about that is you've got Leone and Bender that, I mean, they say that he tries to get away. They push him. They admit to pushing him, is my understanding. And he slips, goes back, and then they take him to some medical personnel and say, where am I wrong there? No, because he doesn't, he's never screened. He's never screened. He spends 36 hours in the cell without being screened. I agree with you after he stays there. But when that happens, they turn him over to someone, right? And then are Leone and Bender gone? No, no, no. He's taken and stripped down and he's put into this cell. The testimony is ultimately from an officer at Harshhorn that she finds this guy's been nude for all this period of time. Right, but is that before or after the shower? My understanding is he showers before that. He is showered before that. All right, he gets arrested. He comes in. Leone and Bender take him to the showers. He tries to get out. They push him back. We don't know, you know, Mr. Smith can't say anything because he has no memory of it. But what they say is that he slips and falls, hits his head. Then they take him to someone who then says he's scraped on the back. And then are Leone and Bender gone after that? Leone's a lieutenant. This is a small jail. This guy is a policymaker. And what you have to do when you have injuries to people or you have these types of use of force, you usually write out reports. This guy, that's why nobody's checking him. You're having shift changes all the time. The medical people have never even brought him in in terms of a screening. They're still relying on that screening two days ago. No, I'm not up to your argument yet because I'm still not convinced of that. After he either slips in the shower after being pushed or they beat him up in the shower, does he see a doctor before the 36 hours or after the 36 hours? No, no. He never sees Gilbert Arguelle as a nurse. He's a nurse and he's the medical director. Does he see a nurse before the 36 hours or after the 36 hours? No. What he sees at the end of the 36 hours is when they send him out. You didn't get my question. I want to know, does he see any kind of medical personnel before the 36 hours when he's lying in the cell or after the 36 hours? He is observed by Gilbert Arguelle right at the period of the 36 hours. He is the medical director who is a nurse. So Gilbert Arguelle, the medical director who's a nurse, observes him at the beginning of the 36 hours? At that time, yes. Okay. That's what I wanted to know. So there is some medical observation at the beginning of the 36 hours. And what he does is he says, we need to get the paramedics and get him out of here. So what you have – But isn't Chesler the first one that sees him after the slip in the shower? Hal Chesler was supposed to see him. He didn't see him. He relied upon the ER's determination that he was screened and could be booked. Now, the next question I had is, I never forget what's the matter with him having his clothes off, unless it's real cold in there. It seems like he doesn't do very well in clothes. He defecates and urinates in them. It seems reasonable to keep his clothes off. Reasonable – what they said is that normally if you have somebody that's nude, it's a sign that they have some kind of psychiatric problem. So they would normally ask to send the individual out. This is a very small jail. And the statement by Arguello was that when in doubt, they send him out. And if there's any type of – because there's not a doctor there. There's nobody on staff that's a doctor. What has to be determined is whether he needs a doctor. And there they got the question, is he brain damaged or just dead drunk? Well, they know he was dead drunk when they picked him up. So – But you don't stay dead drunk, Judge, and that's the difference. How long is it between when they pick him up dead drunk and when he gets hurt in the shower? A few hours. Stay drunk that long, 0.27? Sure you do. But if you do a medical screen, you can make a determination. And there was no screen done, see. If it happened at that point in time or if it happened in the shower. You said if you do a medical screening, you make a determination. It's to pupils usually is what you do. You do a neurological test. And we had a determination here that the Glasgow Coma Scale was seven. Serious, serious situation at the time the paramedics come in. So there's no question at that point in time, this guy has had bleeds. I mean, this isn't just a skull fracture. He's got bleeds. He's got frontals. But he has a very, very serious injury that very likely he would die from. And that's the testimony of Cardinale as well as the others. They believe that he was going to die. But I would submit to you that when Judge George looked at this, he did the proper thing and he looked through the Hudson v. McMillan case. He looked through the five factors that are supposed to be addressed in an Eighth Amendment or a prison-type situation with a pretrial detainee. And that's what he did. He looked to the extent of the injury, the need for the application of force, the relationship between the need and the amount of force used, and the threat reasonably perceived by responsible officials and the efforts made to temper the severity and forceful responses. And then after he did that, he said they didn't provide meaning, the defendants in this action didn't provide him any standard that he could meaningfully look at. And it's – and I would – It looks to me like there are two pieces to your case. One is this material from Zack. And the other is that any halfway serious examination of him after the shower would have shown that he was brain damaged. And I want you to tell me exactly where the evidence is for each of those two pieces. I don't want an argument now about all kinds of other stuff. Just tell me where to look in the excerpt so I can find that evidence. I don't believe – I can submit that to you as a – I really can't tell you right now as I stand here where they are in the excerpt. I can submit that to you, though. But I would like to finish my argument on this Hillel issue because the court never looked – the United States Supreme Court never looked to the law. This statute had been held unconstitutional by the Ninth Circuit Court of Appeals in the Kerry case, and the United States Supreme Court never even looked at that or addressed it in their opinion. And I would submit to you the reason they didn't is because there is an issue about the void for vagueness in this statute. And I would submit that if it isn't raised, and I believe that it was raised in Kerry, that it would be raised at this point in time. Because when we were before the court, Jim Kerry's case was good law. And good law allowed us to have the judge rule in our favor because the Ninth And I would submit to this Court that the same reasoning applies, that it is void for vagueness as to not reaching the reasonable suspicion requirement under Kerry. And unless there are other questions, that's my argument. Thank you, counsel. I don't want to take up – I have two minutes. I just want to make a couple of comments. First, with respect to Hybl, if there's anything further that I need to give you on Hybl, I do know that the United States Supreme Court did look at this statute and did find that it was quite a bit narrower than some of the other statutes that have been held – some of the other stop-and-identify statutes that have been held unconstitutional, primarily the one that was involved in Brown v. Texas. A claim against Leone and Bender, is that excessive force or is that medical, too? Well, my understanding is that the plaintiff is making both claims. And that's why I argued it both ways in the papers that we submitted. I want to clear up something in the record. Hal Chesler has died. He died before he was deposed, but he was interviewed. And Your Honor has asked a question regarding how many times Mr. Smith and when was he seen by medical personnel during his 36 hours in the jail. He was seen immediately at booking, and he was seen three more times, once right after the shower incident, once the next morning at 7.30, and once at 4 p.m. the next day. It was that 4 p.m. examination by Mr. Gilbert Arguello that resulted in him being sent out to UMC. But he was seen four times in the jail. This is not one of those cases. The facts that he sat in a room for 36 hours unmonitored, that's not correct. He was monitored. What was the argument that was made about that there was not enough training of the officers in detecting these kind of injuries? The district court determined that the Monell claim could survive summary judgment against the city and the detention center or police department, because Gilbert Arguello's self-serving type testimony was that he had gone to Chief Ellingson at some time before this incident and suggested some kind of training for officers in order to identify, diagnose and identify closed head injury, and that that training never took place. And the district court determined that that was sufficient to overcome the Monell, the motion for summary judgment that the city made on Monell. I submit that there were ER doctors and nurse practitioners trained medical people in the jail who saw him a number of times and also did not diagnose the closed head injury until sufficient time had elapsed for him to no longer be intoxicated. And it's not clear to me how the district court could find that there could have been an underlying constitutional violation that would result in liability on the part of the city under Monell, but for failure to train when the people that were going to do the training failed to identify and diagnose the head injury themselves. So thank you. Smith versus North Las Vegas is submitted. Oh, yes. Go for it. Oh. We'll take a five minute break. All rise. We'll take a five minute break. We'll take a five minute break. We'll take a five minute break. We'll take a five minute break. We'll take a five minute break.
judges: Oakes , Kleinfeld, Callahan